[Civ. No. 6644.  First Appellate District, Division Two.—April 16, 1929.]

LILLIAN B. O'NEIL, Administratrix, etc., et al., Plaintiffs and Respondents, v. WILLIAM A. ROSS et al., Defendants and Respondents; JOHN I. PETERSON et al., Appellants.

Daniel A. Ryan, Marion Vecki, James M. Thomas, George
F. Snyder and A. Walter Allen for Appellants.

Corbet & Selby, Louis V. Crowley and James P. Sweeney for Respondents.

KOFORD, P. J.—The plaintiff is administratrix of the estates of the two decedents named above, who were children of Martin Johnson, deceased. The action is against the estate of their stepmother, Mary Johnson, who at the time of her death was the widow of said Martin Johnson, deceased. The other parties defendant are heirs and legatees under the will of Mary Johnson and the executors in the estate of Martin Johnson, deceased. This is an action in equity to have it determined that plaintiff is the owner of one-half of so much of the estate of Mary Johnson, deceased, as came to her estate by the will of her husband, said Martin Johnson, deceased. Plaintiff recovered judgment, and the defendants, claiming under the will of Mary Johnson, appeal.

The evidence at the trial was almost entirely documentary. It gives the history of the property in question and shows the manner of its passing from Martin Johnson to his widow, Mary Johnson, which gives rise to this action and the contention of the parties hereto.

Martin Johnson's will was executed May 20, 1914. At that time his wife, Mary Johnson, was living, and also his three children by a former marriage—Johanna, Nellie and Henry. By his will Martin Johnson gave two-thirds of his estate to his three children, share and share alike—that is, two-ninths to each—and one-third of his estate. to his wife. The important provisions of the will in this respect are the following:

"First: I hereby declare that nearly all of the property and estate of which I am now seized or possessed or in which I may be interested is my separate property, and that only a small portion thereof is the community property of my beloved wife and myself, and for the purpose of maintaining my entire estate as one entity I have discussed the foregoing condition of my property relating to separate property and community property with my wife and she agrees with me and is satisfied that the same shall be considered and treated as separate property.

"Second: I hereby give, devise, and bequeath to my said beloved wife, Mary Johnson, in full of all community rights or interest, a one-third (⅓) interest in all the property and

estate of which I may die seized or possessed, in consideration of my dearly beloved wife waiving all community property right or claim to my estate for her community interest under the law or community property rights therein."

Third: Two-ninths to his daughter Johanna.

Fourth: Two-ninths to his daughter Nellie.

Fifth: Two-ninths to his son Henry, less advances.

"Sixth: It is my understanding with my beloved wife, Mary Johnson, that of the one-third (1/3) of my estate devised and bequeathed to her remaining at the time of her death she is to devise and bequeath one-half (1/2) of it to my beloved daughters, Johanna Johnson and Nellie Johnson, in equal shares, and as I have always reposed great confidence in my said wife and know she will comply with my wish, I leave said disposition of that property bequeathed to her for her compliance without further direction; and that the said remaining one-half (1/2) of said one-third (1/3) of my estate so devised and bequeathed to her remaining at the time of her death be by her devised and bequeathed to her son, John A. Peterson, but there shall be deducted from said bequest and devise to him all sums by me advanced to said John A. Peterson as appears on the books of M. Johnson & Co. at the time of my death, with interest thereon at the rate of six (6) per cent per annum from the respective times when the same was so advanced by me to him."

At the end of the will, was an *addendum*, duly signed by Mary Johnson on the date of the execution of the will. She was present at the time of the execution of the will, and Martin Johnson's attorney read said *addendum* over to her and explained to her her rights in the community property of her husband and herself and her right to an interest in his property that was not community property, and the nature of both interests, after which, and in his presence, Mary Johnson signed said *addendum*. "I, Mary Johnson, wife of Martin Johnson, hereby declare that I have read the foregoing will of Martin Johnson and I am satisfied with all of its provisions, and hereby consent to the provision therein *made for and relating to me therein and agree to carry out and fulfill the same* (italics ours), and consent that all of the estate of my husband, Martin Johnson, is and that the same be treated and considered in the distribution and disposition thereof as his separate property, and I

hereby waive all claim to any part thereof as the community property of my said husband and myself, and accept the bequests and devices made to me in said will in full of all claim to community property or community rights. I further declare that I do this with a full knowledge of my property rights which have been explained to me: That I am entitled, in the event of surviving my said husband, to a family allowance and one-half ($\frac{1}{2}$) of the community property and to share as an heir in the remaining portion of the estate of my said husband."

Martin Johnson's two daughters, represented by plaintiff herein, predeceased him. They died in November, 1918. His daughter Johanna left surviving a husband and a son, Robert Cyrus O'Neil.

In January, 1919, Martin Johnson executed the first codicil to his will. In this codicil he said: "First: By reason of the death of my dearly beloved daughters, Johanna M. O'Neil (formerly Johanna M. Johnson) and Nellie Johnson, the redistribution of my estate as in said will mentioned is required and the devise and bequest to my said daughters and my son, Henry Johnson, is hereby revoked." Martin Johnson by said codicil proceeds to dispose of "all the rest, residue and remainder of my estate, being the two-thirds ($\frac{2}{3}$) thereof," in trust for his grandson, Robert Cyrus O'Neil, and his son, Henry Johnson, with deductions for advances and spendthrift provisions for the latter. No mention or disposition is made in the first codicil of the one-third of the estate left the wife by the terms of the will, neither is it mentioned in any of the succeeding codicils.

The third codicil revoked the trust and spendthrift provisions for his son Henry and gave the one-third outright to him "for the reason that he has shown himself to be able, willing, desirous and capable of caring for and managing his property, *and believing he should share equally with my grandson in my estate.*"

The remaining codicils may be omitted. Martin Johnson died June 14, 1921. His estate has not been closed and none of it has been distributed except certain land in Monterey County which went to his son, Henry Johnson, as a part of his one-third share. The inventory and appraisement in his estate showed that he left real and personal property appraised at $206,838.62. Mary Johnson died March 12,

1922, and her estate is also still open and not distributed. One month before she died she executed a will by which, excepting some cash legacies to some of the defendants and appellants, she willed all her estate to her son John Peterson and wife, without deduction for advances and without mention of her deceased stepdaughters. Thus her son John received not only the one-half of the property which he was to have received according to the original plan, but also the advances and the one-half part which, according to that plan, was to have gone to the two daughters of Martin Johnson, but who predeceased both of their parents.

Thus the question is presented: Could Mary Johnson thus devise all of the property to her own son? The judgment appealed from decided that she could not—that upon her death the equitable title to one-half the property, less advances, vested in John Peterson and the other one-half in the estates of the deceased daughters of Martin Johnson.

Upon the documentary evidence introduced the court found that on the twentieth day of May, 1914, Martin Johnson was the owner of valuable properties, being largely his separate property, and on said date he made and entered into a certain contract in writing with his said wife, Mary Johnson; that the following is a copy of said contract, viz.: Here follows a complete copy of the last will and testament of Martin Johnson without codicils, immediately followed by a full copy of the *addendum* to said will signed by Mary Johnson. The findings then continue: That in and by said contract it was agreed by and between said Martin Johnson and his wife, Mary Johnson, as follows: (a) That most of his property was separate property, that only a small portion thereof was community property, but that all of said property was to be considered and treated as separate property; (b) that Martin Johnson would will to Mary Johnson a one-third interest of all his estate in consideration for which Mary Johnson agreed to surrender her community rights; that she would have the use and benefit of said property as long as she lived and that at the time of her death she agreed to devise and bequeath whatever of said property was remaining as follows: One-half thereof to Johanna Johnson and Nellie Johnson, daughters of Martin Johnson. "And she purchased the right to devise and bequeath the other one-half thereof to John A. Peterson,

her son by a former marriage, deducting from the one-half thereof going to John A. Peterson all sums of money advanced to said Peterson by said Martin Johnson up to the time of his death, as the same appeared on the books of M. Johnson & Co., together with interest thereon at the rate of six per cent per annum from the times the said several amounts were so advanced by Martin Johnson. The said Mary Johnson was thereby given the right and power to transmit to her son, John A. Peterson, a substantial part of Martin Johnson's estate.''

From the foregoing findings it appears that the court not only found that Mary Johnson agreed to waive her community claims and to carry out the provisions of the will of her husband, but also that her husband, Martin Johnson, agreed in said contract to make the identical will therein set forth, at least in so far as any rights or benefits are therein and thereby conferred upon his wife, Mary Johnson, and her son.

██ It is well settled by the decisions in this state that one may make a valid and binding contract to devise or bequeath certain property in a certain specified way. (*Morrison* v. *Land*, 169 Cal. 580, at 584 [147 Pac. 259] ; *DeLaurencel* v. *DeBloom*, 48 Cal. 581; *Curdy* v. *Berton*, 79 Cal. 420 [12 Am. St. Rep. 157, 5 L. R. A. 189, 21 Pac. 858] ; *Chase* v. *Stevens*, 34 Cal. App. 99 [166 Pac. 1035].)

The findings of the court went further, perhaps, than the evidence demanded, in that it is found that by said contract Martin Johnson agreed that he *would* dispose of his property by will in that manner. It would be sufficient for the purposes of this case had the findings merely determined that at the date of the transaction the contract was unilateral only. The contract is found to be entirely in writing, and we do not find in it any written words over the signature of Martin Johnson by which he bound himself irrevocably to make that identical will with respect to the provisions under consideration here. It seems more reasonable to interpret the transaction to mean that Mary Johnson agreed to do certain things *if* Martin Johnson made the will and left it until the time of his death. Most of the authorities on contracts to make a will show that one of the parties to the contract has performed. In such cases equitable principles are invoked. ██ One who has obtained

a legacy or devise in consideration of an agreement to do certain things is not permitted to keep the benefits conferred upon him by such promise and at the same time repudiate and refuse to carry out the promise. Equity will impose a trust upon such property. ▆ After the death of Martin Johnson, his widow was obliged to carry out her agreement according to its true intent and lawful meaning. (*O'Donnell* v. *Murphy*, 17 Cal. App. 625, at 629 [120 Pac. 1076].)

To hold that by said transaction between Martin Johnson and wife, the former thereby irrevocably bound himself to leave the said identical last will and testament at the time of his death would be going further than we are willing to go. That would mean that Martin Johnson had no right thereafter to make a different will or to revoke the one he made no matter what might happen making such a course desirable. Equity and justice would be well satisfied by holding that if Martin Johnson had revoked or changed the said will during his lifetime after the said arrangement with his wife, it would simply have the effect of releasing his wife from her promises and have given her the right to claim her full community interest and make whatever other claim she wished during the administration of her husband's estate.

The difference between these two interpretations of the contract is not vital to the present case because Martin Johnson performed his part and did in fact make and leave the said will as contemplated, at least to the extent of performing the promises moving to Mary Johnson. This is true even though it be determined that he revoked certain parts of his will, as contended for by appellant. ▆ The claimed revocation is of such a nature as to increase rather than diminish the estate devised to his wife, it being claimed that by his codicils he showed a testamentary intention to give her outright a fee-simple title in the said one-third without any requirement as to how she should devise the unexpended remainder thereof. ▆ We hold herein that, if he wished to do so, no contract obligation to his wife prevented Martin Johnson from revoking the provisions of his will, including paragraph six, beneficial to his own two daughters or not beneficial to his wife's son, John Peterson; and that the contract created no direct obligation between himself and the said ultimate beneficiaries giving them any vested rights in such provisions during his lifetime. If there is an excep-

tion to this last statement with respect to John Peterson, it should be noted that no claim of revocation is made respecting the provisions beneficial to John Peterson. In passing we wish to say that there is at least considerable force to the argument that the codicils made by Martin Johnson evince an intention to revoke the benefits of paragraph six, beneficial to his two daughters, but we are unable to find in the codicils anything indicating a testamentary intention to forgive or release the requirement that there shall be deducted from John Peterson's share advances made to him by the testator. In this opinion we do not decide whether Martin Johnson revoked paragraph six of his will for reasons which are hereinafter set out.

Whether or not said Martin Johnson by any of the five codicils expresses an intention to revoke the provisions of paragraph six of his will which were beneficial to his two daughters, is a matter which we need not consider in determining the rights of the estates of the said two daughters because we have concluded that the provisions for the said two daughters have lapsed by reason of their death occurring not only before the death of their stepmother, Mary Johnson, but also before the death of their father, Martin Johnson. If the provisions for the benefit of the said two daughters failed or lapsed by reason of their having predeceased both parents, it follows that their estates have no interest in the subject matter of this action.

Martin Johnson's will devised and bequeathed to Mary Johnson a fee with a special power to devise and bequeath the same at her death to certain specially named and designated children. If this special power was not mandatory the contract made it so as far as it operated. The will did not undertake in express words to give her merely a life estate. The will did not give her discretion in the matter of devising the property, and, therefore, the power is special or particular and not general and discretionary.

Although the words of the will in this respect may be only precatory (2 Underhill on the Law of Wills, secs. 792 and 795), they being directed to the testator's wife and agreed to in writing by the wife, they should be considered as mandatory. "The interest of the persons named who are in the end to benefit by the appointment, if the power is special, is a contingent use or an executory devise until, by

the appointment, the legal estate becomes vested in them. This equitable interest they take under the original instrument by which the power is created, and not by the appointing instrument.'' (2 Underhill on the Law of Wills, sec. 798.)

A special and mandatory power is obligatory upon the donee and is raised in equity as a trust or a power in trust and the execution of that power may be enforced in equity in the same way as a trust. In default of the execution of the power by the donee, a gift will be implied to the beneficiary of the intended appointment, especially where the original testator has directed a gift over to the appointee in case the donee fails to exercise the power of appointment. (2 Underhill on the Law of Wills, sec. 802.) From the same section we quote the following:

''A distinction is made, in the event of a total failure to exercise a power, between the case of an out and out gift to a class of persons with a power in some third person to appoint in what proportion each member of the class shall take, and a mere direction to the donee of a power to appoint by his will the property given to him among the class. In the former case, where the donee fails or neglects to execute the power, and there is no disposition of the property to strangers in default of an appointment, the gift is regarded as a vested gift to the members of the class who are living at the death of the testator, subject to being devested or diminished by the subsequent execution of the power by the donee, and upon a total default of an appointment the fund will be equally divided among all members of the class who were living at the death of the testator.

''But where there is no gift in express terms in the will to the class directly, but only a power of appointment is created directing the donee to divide by will property among the class, only those persons are objects of the power and take in default of an appointment who survive the donee when his will becomes effective at his death. In the latter case the court will imply an intention to give the property, on a default of an appointment, to those persons only among whom the donee might have distributed the property, and on the failure or the neglect of the donee to exercise the power it will be exercised accordingly among those persons. Where property is given to A. for life, with a power in him

to devise the same to his children, but no express devise to the latter, nor any devise to them or strangers in default of an appointment, the court will execute the power among a class composed of A.'s children living at his death, and not among the children of A. living at the death of the donor of the power. The class will be ascertained and the power executed by the court upon a default in its execution by the donee as of the date of his death, excluding from its operation all persons who, though they would have been members of the class had they survived, have died before the donee.''

In the instant case we are not concerned with the question of whether the provisions for the two daughters would have failed if they had died before the donee and appointer but after the donor because in this case the daughters predeceased both.

*Smith* v. *Hardesty,* 88 Md. 387 [41 Atl. 788], relied upon by respondent, is controlled by the principle that there the testator himself made a gift over in case of the failure of appointment and also by the principle that although the children of the donee and appointer died before her, yet they survived the testator and donor. It was held that upon the failure to exercise the appointment the title went to the children of the only intended appointee who left children, but in that case the testator himself made a direct devise to the children of all property which the donee failed to devise so that it vested in the named appointee by the will and death of the original testator which occurred during the life of that intended appointee and so having vested, it descended.

A power of appointment among children as a class is not validly executed by appointment among grandchildren. (2 Underhill on the Law of Wills, sec. 803; 2 Sugden on Powers, p. *253.) Nor is any appointment authorized to the executor to a deceased child. (2 Sugden on Powers, p. *260, see, also, pp. *264 and *271.)

'' . . . a devise to children who are specifically named is a devise to them as individuals and not as a fluctuating class. Those who are alive at the date of the will corresponding to the names, if they survive the testator, will take, but no others, and the shares of those who predecease him will lapse in the absence of a statute preventing lapse.''

(2 Underhill on the Law of Wills, p. 720, sec. 552.)
The estates of the two daughters, therefore, took nothing
under the will of their father.

The last quotation leads us to consider the effect of
Civil Code, section 1343 and section 1310. The former sec-
tion provides that if a devisee dies during the life of a tes-
tator the testamentary disposition to him fails unless an in-
tention appears to substitute some other in his place except
as provided in section 1310. Section 1310 provides that if
devisee is a child or relation of the testator and dies before
the testator or even before the will is executed, leaving lin-
eal descendants then such descendants take the estate given
by the will in the same manner as the devisee would have
done had he survived the testator. These statutory provi-
sions are of no benefit to the plaintiff in this case who is
the administratrix of the estates of both of the deceased
daughters. The testamentary disposition of the two daugh-
ters failed. If it be true that in the instant case Robert
Cyrus O'Neil, the only surviving child of Johanna O'Neil,
would take his mother's share by the operation of Civil
Code, section 1310, then he takes it directly from the estate
of Martin Johnson, deceased, and not through the estate of
his mother. (*Estate of Parsell*, 190 Cal. 454 [25 A. L. R.
1561, 213 Pac. 40].) Therefore, the administratrix of his
mother's estate cannot represent him with respect to his
share, if any, and she is not entitled to invoke the jurisdic-
tion of a court of equity in his behalf or to bind him in this
litigation with respect to his share, if any, which would come
to him by force of Civil Code, section 1310.

Respondent claims that where a devise is made in
pursuance of a valid contract for a good or valuable con-
sideration, as for a payment of a debt or for services and
the like, that the devise does not lapse upon the devisee pre-
deceasing the testator. Respondent claims in one part of
her brief that Mary Johnson should have carried out her
agreement literally, and, notwithstanding the death of the
two daughters, should have left a will devising to them one-
half of the unspent remainder of the property devised to
her by her husband. That in such case Mary Johnson
would have been making a devise to them not as her own
gift or bounty, but expressing her sense of obligation by
reason of her contract. That, therefore, such devise by her

would not lapse, but would pass to the administratrix of the estates of the two daughters. We cannot agree with this argument. It is opposed to the principle that the appointees of a power take from the original testator and not from the appointer. (2 Alexander's Commentaries on Wills, sec. 700; vol. I, sec. 280; 2 Underhill on Law of Wills, sec. 798; *Lederer* v. *Pearce,* 266 Fed. 447 [18 A. L. R. 1466] ; *Estate of Bowditch,* 189 Cal. 377 [23 A. L. R. 735, 208 Pac. 282].) It would be more proper to say, therefore, that such a devise by Mary Johnson would be expressing the bounty and parental affection of Martin Johnson as his agent. Furthermore, to say that such a devise by Mary Johnson would have been given out of a sense of obligation is to assume that first it must be done under her contract and then to say that since it must be done it does not lapse. There are no words used nor intention shown that Mary Johnson should make any devise to deceased persons. The agreement of Mary Johnson to devise one-half of the unspent portion of the property to the two daughters as well as any obligation to do so apart from her contract, became impossible of performance because they predeceased both parents. (31 Cyc., pp. 1052 and 1053.)

The foregoing would seem to dispose of every claim which the plaintiff as administratrix of the two daughters' estates is entitled to make. The trial court, however, came to a different conclusion holding that the interests of the said two daughters did not lapse but vested in their estates, and, because it had jurisdiction of all necessary parties upon that theory, it proceeded further to determine all the legal and equitable titles to the said property. In so doing the court decided that John A. Peterson, also known as John I. Peterson, who was the principal devisee and legatee of his mother's will, could take no more of said property than was originally intended for him at the time of the transaction between his mother and his stepfather, Martin Johnson. For several different reasons John Peterson, who is appealing from the decree of the trial court, claims that his mother was vested with a fee simple in all of the property devised and bequeathed to her by Martin Johnson. He does not complain that his wife was made a cotenant with him in the property attempted to be given him by his mother's will, neither does he complain of the cash bequests

made by his mother to several of the parties defendant who are also appellants here. He, of course, complains of the decree of the trial court which decrees that he shall have only one-half of the unexpended remainder of the mother's estate derived from Martin Johnson, less advances made by Martin Johnson, together with interest on the same amounting to $9,536.58.

It is the duty of this court as well as it was the duty of the trial court sitting as a court of equity to determine all controversies with respect to the subject matter necessary to a complete determination of the matter, but, of course, within the limits of its jurisdiction of subject matter and person. (10 Cal. Jur. 496, 498; *Barber* v. *Superior Court,* 43 Cal. App. 221 [184 Pac. 952]; *Swan* v. *Talbot,* 152 Cal. 142 [17 L. R. A. (N. S.) 1006, 94 Pac. 238].) Some of the grounds of appeal urged by appellant, John Peterson, are beyond the limits of our jurisdiction either of subject matter or person.

Having determined that the provisions of the original arrangement for the two daughters of Martin Johnson has lapsed and failed, we find John Peterson, of course, claiming that, inasmuch as the will undertook to devise his mother a fee, and there is no gift over in case of the failure of appointment, that his mother became immediately vested with that half portion which would have otherwise gone to the two deceased daughters of Martin Johnson. We may consider this with respect to that share which would have gone to Nellie Johnson who died without issue, because we have sufficient jurisdiction. With respect to that part, however, which would have gone to Johanna Johnson and who died leaving her surviving an only son, Robert Cyrus O'Neil, we find a limitation upon our jurisdiction of person. If Robert Cyrus O'Neil wishes to claim that by force of Civil Code, section 1310, he is entitled to the share which would have gone to his mother, Johanna, had she survived Martin Johnson, then a controversy arises between John Peterson and the estate of his mother on the one hand, and Robert Cyrus O'Neil on the other hand claiming in his original right directly and not through his mother's estate or the administratrix thereof. In this controversy he is not represented by the plaintiff administratrix for such property would not pass through his mother's estate. Neither is Robert Cyrus

O'Neil represented in that controversy by the executors of the estate of his grandfather, Martin Johnson, deceased. They no more represent him than they do John Peterson or the estate of Mary Johnson, deceased, in that controversy. (*Estate of Parsell, supra.*) Therefore, should we now decide that Robert Cyrus O'Neil had no interest in this part of the subject matter of this action, it would have the effect of taking from him his claim to property of considerable value without his having been represented or without having had his day in court.

It is also the claim of John Peterson upon this appeal that by some of the five codicils to the last will and testament of Martin Johnson, deceased, he expressed an intention to and did revoke those provisions of his will contained in paragraph six beneficial to the daughters. In other words he argues for such a revocation of certain parts of the will as would make the devise to his mother an unlimited fee instead of a mere life estate with power of appointment. With respect to this contention our jurisdiction of person is also limited by reason of Robert Cyrus O'Neil's not being a party to this action nor represented. Our jurisdiction to determine whether any of the provisions of said will have been revoked by implication is advisory upon the probate court and is confined to those matters that are incidentally necessary to determine a question which is properly before the court. (11 Cal. Jur. 266, 267; *Adams* v. *Prather,* 176 Cal. 33 [167 Pac. 534]; *Burton* v. *Burton,* 79 Cal. 490 [21 Pac. 847]; 12 Cal. Jur. 203.) This may be a matter exclusively within the jurisdiction of the probate court. But if we assume jurisdiction of the subject matter and proceeded to decide that the provisions of Martin Johnson's will which may be beneficial to Robert Cyrus O'Neil have been revoked by implication, we would also be deciding upon Robert Cyrus O'Neil's claim of property without his being a party to this suit and without his being represented. He is entitled to his day in court upon that question so far as it affects him. Of course the probate court having jurisdiction of the will and estate of Martin Johnson, deceased, and also the probate court having jurisdiction of the estate of Mary Johnson, deceased, has jurisdiction of the person of Robert Cyrus O'Neil in determining who are

entitled to take by distribution the property of either one of those estates.

While we do not have jurisdiction to declare Robert Cyrus O'Neil's rights under Civil Code, section 1310, nor his rights under that section as they would be affected by a revocation of the provisions of paragraph six beneficial to his mother, there are other aspects of the case in which his interest as a residuary legatee or heir of Martin Johnson, deceased, are indirectly affected and in which the executors of the latter's will represent him. Among these are whether the lapsed share originally intended for Nellie Johnson is vested in Mary Johnson's estate or remains in Martin Johnson's estate and the determination which the trial court made of the amount of advances which are to be deducted from John Peterson's share and retained in the *residuum* of Martin Johnson's estate.

The jurisdiction of this court is to interpret and declare the rights of the parties before it within the limits of its jurisdiction. We proceed therefore to interpret the contract, declaring the rights in said contract between those who are parties to this action or represented, determining what interest, if any vested by said contract, in whom it vested and when, and also determining what provisions of said will, if any, Martin Johnson was not prohibited by said contract from revoking.

The contract in its essence was that Mary Johnson waived her community property rights in consideration of Martin Johnson's giving her a one-third interest in his estate which she was at liberty to use, both income and *corpus* during her lifetime as she saw fit with the *privilege* of devising one-half the remainder less advances to her own son, John Peterson, and with the *duty* and *obligation* of devising the remaining one-half of the property to the two named daughters of her husband. She was interested in what she was to receive during her lifetime and what she could do for her own son upon her death. This is the most, if anything, she purchased—the consideration moving to her. The provision requiring deduction of advances made to John Peterson and the provision requiring a devise to the two daughters of Martin Johnson, were not considerations moving to Mary Johnson. She did not purchase them. The provisions last mentioned represented property which was

in effect withheld from her and neither granted nor promised to her by Martin Johnson. These provisions represented property remaining in Martin Johnson. To say that she purchased the property represented by these said last-named provisions by her agreement to be content with the provisions in the will made for her, is contrary to the facts as disclosed by the findings, by the will, and by what is known of the wishes of persons similarly situated. If we should concede that Mary Johnson by her agreement purchased an interest in the property for the two daughters of Martin Johnson by agreeing to be content with the one-third as devised and bequeathed to her and by not demanding more, the same thing could be said with respect to all the remaining two-thirds of the estate of Martin Johnson thus released for all the remaining devisees and legatees amongst whom it is divided by Martin Johnson's will. This, of course, was foreign to their intentions. From this it follows that Martin Johnson if he wished to do so after the execution of his will and the *addendum* thereto, could revoke the provisions in his will made for the benefit of his said two daughters and that for the same reason if he wished to do so, he could also revoke the provisions requiring deduction of advances made to John Peterson. On the other hand, he could not, if he wished to do so, revoke any provision which would injuriously affect the benefits conferred by the will upon Mary Johnson personally or upon her son John Peterson. No claim is made that he did the latter.

What we have said about the right of Martin Johnson to revoke certain provisions of his will is said while assuming that the contract at the time it was made was a bilateral and irrevocable contract upon the part of Martin Johnson. Considered as a unilateral contract it should be understood as declaring what Martin Johnson had to perform in order to make it obligatory upon his widow to carry out her promises after his death.

Respondent claims that the contract created an express voluntary trust which could not be revoked without the consent of the trustor, Martin Johnson, the trustee, Mary Johnson, and the beneficiaries, the two daughters of the former and the son of the latter. The agreement was at most merely an agreement to make a will on the part of the one and an agreement to carry it out on the part of the

other and, therefore, it partook only of the nature of a will which was ambulatory so far as the ultimate beneficiaries were concerned. (*Buckley* v. *Gray*, 110 Cal. 339 [52 Am. St. Rep. 88, 31 L. R. A. 862, 42 Pac. 900].) There was no conveyance. The contract, as such, did not convey any property to Mary Johnson and she, therefore, was not a trustee during the lifetime of her husband. (*Nichols* v. *Emery*, 109 Cal. 323 [50 Am. St. Rep. 43, 41 Pac. 1089].) Neither was it a declaration of trust on the part of Martin Johnson making himself trustee. It was not the understanding of the parties to those documents nor is it the law that at the instant the said will and *addendum* were executed there vested an inheritable property interest in Mary Johnson nor in John Peterson nor in Martin Johnson's two daughters.

The contract if considered as a bilateral contract made for the benefit of third parties did not vest any property interest in the daughters at the time it was made. Considered as such a contract, it could be rescinded under the provisions of Civil Code, section 1559. If Martin Johnson wished to rescind the contract in so far as its provisions were for the benefit of his two daughters and permit the surviving wife to take one-third of his estate without any limitations, he could do so in this case, for, in so far as the consent of the other contracting party would be necessary to such rescission, it is found in the will of Mary Johnson where she undertook to devise all of the property as her own in fee. The contract, however, was not made *expressly* for the benefit of the two daughters and was not enforceable by them during Martin Johnson's life. His two daughters were only incidentally benefited by the contract with respect to their possible ultimate share in the one-third part of his estate in substantially the same way as those who were to share in the remaining two-thirds of his property.

With respect to the share of John Peterson it is immaterial whether any interest therein vested at the date of the contract because no attempt to revoke his devise and bequest was made nor claimed by his adversaries and because in any event his proper intended interest has vested in him as from Martin Johnson's estate. We need not, therefore, compare a wife's promise to waive certain community property rights and to carry out her husband's will as a consid-

cration for the latter's promise to make a certain will with cases where the devisee has taken possession and made expenditures and assumed obligations upon the faith of that promise such as the case of *Ballard* v. *Camplin,* 161 Ind. 16 [67 N. E. 506], cited by respondent.

No interest having vested in the two daughters during the lifetime of Martin Johnson, there was no trust until his death. At that time in so far as he had devised a fee title to his widow, for purposes of enforcement she was considered in equity a trustee with the duty of devising the unexpended remainder in accordance with the true intent and lawful meaning of the. written understanding by which she obtained that fee. To the extent that she may have failed to carry out said agreement and to execute the power of appointment contained in Martin Johnson's will, equity will enforce the agreement by decreeing that the proper intended beneficiaries of that power are the equitable owners of the property intended for them. The sole object of the court in exercising the power in trust which is contained in a will, is to carry out the intention of the testator. (2 Underhill on the Law of Wills, sec. 802.)

Having determined that the share intended for Nellie Johnson has lapsed and has become impossible of performance and that the same thing is true as to Johanna Johnson O'Neil's share in case the probate court does not determine that it has vested in Robert Cyrus O'Neil, it is necessary to determine in whom the share intended for said daughters vested to the extent that said share or shares have lapsed. We consider three points in this connection: First. Whether the provisions of paragraph six of the will are precatory and for that reason Mary Johnson at the death of her husband became vested with a fee title free from any condition or limitation. Second. The same contention is made even though the provisions of paragraph six are held not to be precatory, it being claimed that a devise of a remainder after a devise of the fee is nugatory. Third. The two foregoing points are urged irrespective of whether the two daughters predeceased their father or not, but we consider them in connection with the fact that the daughters did predecease their father.

We need not consider the contention that Martin Johnson revoked the provisions of paragraph six of his will intend-

ing thereby to devise his widow a fee-simple title in the one-third interest of his estate any further than to state that in such case, of course, the title vested in his widow under the terms of his will at his death.

1. In passing upon the first two contentions last named, it must be borne in mind that we are interpreting a contract rather than a will. The agreement of Mary Johnson to carry out the provisions of the will make it unneccessary for us to determine whether the provisions of paragraph six if they stood alone would be precatory only and could not cut down the fee devised to her in paragraph two. She agreed to carry out and fulfill the provisions of the will relating to her and this agreement could have no application if it did not refer to paragraph six. She could agree to carry out her husband's wish and understanding as well as his command. As said in *DeLaurencel* v. *De Boom*, 48 Cal. 581, 585, it is to be assumed that had she not agreed, a different will would have been made. Specifically, in this case he could have given his wife a life estate only with remainder to the children in express words. This feature distinguishes this case from those cases where no express contract was made by the devisee such as, *Tillman* v. *Ogren*, 182 App. Div. 672 [169 N. Y. Supp. 949], *Estate of Marti*, 132 Cal. 667 [61 Pac. 964, 64 Pac. 1071], and *Estate of Hull*, 77 Cal. App. 792 [247 Pac. 1093].

2. The same thing can be said about appellants' argument that a devise in fee in one part of the will cannot be cut down by a devise of the remainder. We have here a contract to perform certain things with that fee. The devise of the fee, therefore, is not inconsistent with paragraph six for that devise is a part of the performance of that contract. We cannot follow appellants in their argument, which amounts to a contention that we must first interpret the will by itself and that if we find that by reason of its precatory words or attempted devise of a remainder following the devise of a fee the provisions of paragraph six are nugatory, and Mary Johnson could keep the whole title free from any obligation to carry out paragraph six. This is the equivalent of saying that she agreed to carry out only those provisions of the will which would be enforced by the probate court or that she contracted to do only those things which the law would compel her to do without the said con-

tract. Such a contention is in effect an argument that she assumed no contract obligations whatever.

3. In determining the title to the lapsed share of Nellie Johnson and the shares of Johanna Johnson O'Neil in case it has not passed to Robert Cyrus O'Neil under Civil Code, section 1310, we are not guided by the contract, because it made no provision for such contingency. In this contingency the property remains as it is devised by the will according to its lawful meaning. The will did not expressly limit Mary Johnson to a life estate only. Neither did it do so by implication by making a gift over in case of the failure of the power of appointment. This case is, therefore, not governed by *Hardy* v. *Mayhew*, 158 Cal. 97, 100, 101 [139 Am. St. Rep. 73, 110 Pac. 113], where it is said: "The distinction between the case of an intended gift of an absolute title to one with an attempted gift over of simply 'what remains unexpended' by the donee at the time of his death. where the gift over is void because in derogation of the absolute fee given the first taker, and the case of a gift of a life estate with a power of disposition for a particular purpose only, with an express gift over of what remains unused for such purpose, is recognized by all the authorities." The last-cited case and the numerous authorities reviewed therein are cases in which either the testator expressly limited the interest of the first taker to a life estate or did the same thing by expressly devising the unexpended remainder himself directly by his will, so that in no event could the first taker have more than a life estate with power to use the principal for certain purposes during his life. In the present case Martin Johnson not only devised a fee to his widow, but also failed to direct a gift over by his own will in case of failure of the power of appointment by its becoming impossible of performance. The devise to Mary Johnson was, therefore, a fee title subject to be divested by the intended appointment and to the extent that the power of appointment failed by becoming impossible, the fee was not divested, but remained in Mary Johnson. (2 Underhill on Law of Wills, secs. 868, 876; 2 Alexander's Commentaries on Wills, sec. 1045; *Estate of Marti*, 132 Cal. 666, 672 [61 Pac. 964, 64 Pac. 1071].) Upon the death of Martin Johnson the share intended for his deceased daughter, Nellie Johnson, vested in his widow, and also the

share of Johanna Johnson O'Neil unless her son, Robert Cyrus O'Neil, took it under Civil Code, section 1310. It did not remain in his own estate because his will does not show an intention that in any event his widow should not have more than a life estate.

We conclude that, to the extent that the probate court having jurisdiction of the administration of the estate of Martin Johnson, deceased, may determine that said testator revoked any of the said provisions of his will beneficial to his own two daughters, or even to his stepson, John Peterson, that part of the unexpended remainder of the one-third portion of his estate devised and bequeathed to his widow affected by such revocation vested upon his death in Mary Johnson in her lifetime and is distributable to her estate in fee. That to the extent that said provisions may be found by said court not to have been revoked, such one-third portion of his estate remaining unexpended, after deducting for Mary Johnson's estate the portion she took or used during the brief period of her survivorship after Martin Johnson's death, has vested as follows: ·

The one-fourth interest intended for Nellie Johnson, now deceased, in Mary Johnson's estate; the one-fourth interest intended for Johanna Johnson O'Neil in Mary Johnson's estate provided the probate court decides that Robert Cyrus O'Neil does not take it under Civil Code, section 1310, otherwise in said Robert Cyrus O'Neil; the one-half interest intended for John Peterson in said John Peterson and is distributable to him directly from Martin Johnson's estate, but first deducting therefrom advances and interest to the date of Mary Johnson's death as determined by the trial court in the sum of $9,635.58, which sum remains the property of the estate of Martin Johnson, deceased.

As so modified the decree is affirmed, appellant to recover costs.

Sturtevant, J., and Nourse, J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on May 16, 1929, and a petition by respondent to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on June 14, 1929.

All the Justices present concurred.